**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| **RICHARD SHERMAN,**  Plaintiff, | ) ) ) |
| v. | ) Case No. _____ ) |
| **BERKADIA COMMERCIAL MORTGAGE LLC,**  Defendant. | ) **JURY TRIAL DEMANDED** ) ) ) |

## COMPLAINT

COMES NOW Plaintiff Richard Sherman, by and through undersigned counsel, and for his Complaint against Defendant Berkadia Commercial Mortgage LLC ("Berkadia" or "Defendant"), states and alleges:

### Nature of Case

1.  This is a lawsuit by Plaintiff, in which Plaintiff brings claims against Defendant arising out of his employment relationship with Defendant. Specifically, Plaintiff asserts a claim under the anti-retaliation provision of the False Claims Act and a wrongful discharge claim under Missouri law, as well as a quantum meruit claim under Missouri law for being denied a bonus payment to which Plaintiff was legally entitled.

### Parties, Jurisdiction, and Venue

2.  The anti-retaliation provision of the False Claims Act, 31 U.S.C. § 3730(h), authorizes court actions by private parties to recover damages for violation of that provision. Jurisdiction over Plaintiff's False Claims Act claim is based on 31 U.S.C. §3730(h) and 29 U.S.C. § 1331.

3.  Jurisdiction over Plaintiff's Missouri law claims is based on 28 U.S.C. § 1332 and/or 1367.

1

4. Plaintiff is a resident of the State of Missouri, and previously worked for Berkadia from July 11, 2011 until October 13, 2017.

5. Defendant Berkadia Commercial Mortgage LLC is a limited liability company organized under the laws of the State of Delaware, and its principal place of business is located in Pennsylvania. Defendant is licensed to do business in the State of Missouri, and at all relevant times, has maintained an office in St. Louis, Missouri, the office location where Plaintiff worked while employed by Defendant.

6. Venue in this district is proper pursuant to 31 U.S.C. § 3732(a) and/or 28 U.S.C. § 1391 because Defendant does business in this district and employed Plaintiff to work in this district, and because substantial unlawful conduct giving rise to the claims set forth in the Complaint occurred in this district.

**General Allegations**

7. Plaintiff began his employment at Berkadia on July 11, 2011, after being approached by Berkadia.

8. Plaintiff was initially hired by Berkadia as Vice President and Chief Underwriter.

9. Subsequently, Plaintiff was promoted to Senior Vice President and Chief Underwriter and was designated by Berkadia in March 2016 as the Company's approved Chief Underwriter by the federal government.

10. Throughout Plaintiff's employment with Berkadia, Plaintiff's formal written performance reviews were acceptable or better, and Plaintiff received increases in compensation.

11. Defendant Berkadia Commercial Mortgage LLC is a joint venture of Berkshire Hathaway and Leucadia National Corporation. Berkadia is engaged in the commercial real estate finance business. Berkadia is one of the largest originating Federal Housing Administration

("FHA")-insured commercial lenders in the industry. Berkadia provides financing for multifamily (apartments) and healthcare facilities (assisted living, skilled nursing, and hospitals).

12. As a lender, Berkadia is licensed and authorized by the federal government, and specifically, the U.S. Department of Housing and Urban Development ("HUD") to originate, underwrite, and recommend mortgage loans to be funded by Berkadia and insured by the FHA, including determining a borrower's creditworthiness and whether each proposed loan meets all applicable HUD requirements.

13. The regulatory scheme governing FHA-approved lenders such as Berkadia is established by the National Housing Act, 12 U.S.C. § 1701 *et seq*. The National Housing Act, in turn, authorizes HUD to make such rules and regulations as may be necessary to carry out the provisions of the National Housing Act. *See* 12 U.S.C. § 1715b.

14. The federal government explicitly requires lenders, such as Berkadia, to follow applicable federal regulations and underwriting requirements in originating and underwriting mortgage loans for FHA insurance. These regulations include, but are not limited to, the MAP Guide, LEAN Handbook, Mortgagee Letters, Notices, etc., as well as the regulations set forth in Title 24 of the Code of Federal Regulations, specifically including 24 C.F.R. § 200, *et seq*.

15. In addition, HUD requires lenders, such as Berkadia, to implement and maintain a quality control program, including a written Quality Control Plan, in accordance with HUD requirements for FHA-insured loans in order to maintain lender status. *See, e.g.*, 24 C.F.R. § 202.5(h).

16. Specifically, the federal government's quality control guidelines and the Berkadia Quality Control Plan ("QC Plan") both require Berkadia to maintain at all times a "bright line" separation between origination and underwriting functions, which is referred to as the "Bright Line

3

Rule," which Plaintiff was required to certify personally with every recommendation made to the federal government by Berkadia.

17. Additionally, the QC Plan includes requirements that the MAP Lender will exercise prudence and due diligence in assuring that the MAP Lender originators: (a) cannot perform the role of underwriter for projects they originate or hire contractors on behalf of the underwriter; and (b) must certify for each loan conflicts-of-interest with the proposed mortgagor or other transaction participants.

18. HUD requires lenders to self-report to HUD all findings related to FHA-insured mortgage loans that constitute material violations of FHA or mortgage requirements, that represent an unacceptable level of risk, and/or that amount to fraud or other serious violations.

19. Lenders are also required to take prompt action to deal appropriately with any material findings.

20. In order to maintain lender status, HUD requires lenders, such as Berkadia, to certify (on the submission of each loan application) that they have complied and will comply with HUD regulations, handbooks, policies, etc.

21. Additionally, HUD requires a lender, such as Berkadia, to submit an Annual Certification stating that it conforms to all applicable rules/regulations.

22. Alternatively, HUD requires a lender, such as Berkadia, to submit a statement to HUD that it was unable to so certify and to explain why it could not execute the certification.

23. These certifications are a requirement for Berkadia to maintain its FHA insured lender approval.

24. As Chief Underwriter, Plaintiff was responsible for oversight of all aspects of risk assessment and all recommendations related to the FHA-insured finance segment for all

4

multifamily and healthcare submissions. The responsibilities included, but were not necessarily limited to, all aspects of risk assessment, management of employees (underwriting and processing), training, processes, procedures, compliance with governmental regulations, and development of relationships within the FHA-insured industry.

25. HUD considers a Chief Underwriter such as Plaintiff to be the focal point of the program and the person approved to uphold the requirements of the program and the Berkadia QC Plan.

26. The oversight provided by Plaintiff encompassed production volume in excess of $6 billion in financing over Plaintiff's five-plus years of employment with Berkadia.

27. At the time Plaintiff became employed with Berkadia in 2011, Berkadia was subject to a warning letter and, possibly, on probation with HUD for having violated HUD rules in connection with one or more loan submissions.

28. Part of Plaintiff's role was to bring Berkadia into a better compliance posture with respect to the HUD/FHA-insured program.

29. Within the first two months of his employment with Berkadia, Plaintiff met with a senior official at HUD and was told that there were significant "bright line" issues that needed to be addressed at Berkadia, and the annual audits conducted by HUD prior to Plaintiff's employment specifically referenced "bright line" issues at Berkadia.

30. Plaintiff's relationship with HUD, which was very good at the inception of his employment with Berkadia and only strengthened over time, was instrumental in Berkadia's efforts to be removed from probation and back into HUD's good graces, which included improving HUD's rejection rate on Berkadia loan submissions from over 18% to less than 3%.

31. In addition, a HUD official has referred to Plaintiff as "a star" both in writing and to Plaintiff's former Berkadia supervisor, Phil Long.

32. As Chief Underwriter for Berkadia, Plaintiff was responsible for every loan submission to the federal government, as well as adherence to the requirements of the Berkadia Quality Control Plan, which was required by the federal government.

33. As a result of his responsibilities, if Plaintiff assessed that a particular loan did not comply with HUD requirements (including the requirement that there be a "bright line" separation origination and underwriting), he was not permitted to recommend the loan request be insured by the federal government nor submit the loan request.

34. Plaintiff informed Berkadia management – including but not limited to Phil Long and Steve Ervin, as well as members of Plaintiff's staff – that if a loan did not meet HUD requirements, the loan request would not receive Plaintiff's required signed approval. Plaintiff discussed this issue many times with multiple Berkadia employees.

35. As an example, just a few weeks before Plaintiff's termination, one of Berkadia's largest producers received an indication that the appraised value on a Borrower's project would be below what he had promised the Borrower. As a result, the producer, in direct violation of the "bright line" requirement, blatantly "appraisal shopped" and directed that another Appraiser (with whom the producer had already spoken) be retained. Plaintiff immediately brought that issue to the attention of Phil Long (in an email with the subject line of "Appraisal Shopping"), and Mr. Long took no action. The producer's appraisal shopping is considered a serious offense under the applicable HUD guidelines that could be the basis for suspension or termination. This was only one of numerous bright line issues that was brought to Mr. Long's attention within a relatively short period of time prior to Plaintiff's termination.

36. Notwithstanding Plaintiff's substantial efforts to bring Berkadia into HUD compliance, he encountered resistance from Berkadia's senior management and the internal culture of promotion production and profits to the detriment of underwriting and HUD compliance, and Plaintiff's only remaining recourse was to disapprove submissions that violated the required federal government guidelines.

## Calabash Project

37. In 2013, a HUD compliance officer approached Berkadia about a loan transaction, underwritten by Berkadia prior to Plaintiff's date of hire, on a project known as Calabash Town Center. The loan funded by Berkadia and insured by FHA was in the approximate sum of $14 million.

38. The loan on the Calabash project was in default, and the federal government began an investigation into the loan that was recommended by Berkadia (or its predecessor) as Berkadia had requested the loan be assigned to HUD to be paid as a claim against the FHA insurance fund.

39. As part of its effort to investigate the Calabash loan transaction, HUD requested information and documents from Berkadia.

40. Plaintiff learned that the Berkadia loan originator on the Calabash project perpetuated a fraudulent, material misrepresentation and violation of the "bright line" rule by removing approximately $700,000 in impact fees (costs associated with the loan request) from the loan deal, as the Borrower would not have qualified as acceptable due to the Borrower's inability to meet the cash requirement required by the federal guidelines.

41. On July 1, 2013, Plaintiff emailed Randy Jenson (the then-President of Berkadia) about his concerns relating to the Calabash project and his information of the same, including his concerns of bright line violations.

7

42. Despite Plaintiff's request for Mr. Jenson (and Berkadia) to do the right thing and disclose to HUD the underwriting deficiencies on the Calabash project, Mr. Jenson and Berkadia's Executive Committee made a material misrepresentation to the federal government on July 18, 2013 for the purpose of misleading the federal government of the true facts which, if known, would have subjected Berkadia's license as an approved FHA-insured Lender to sanctions (including suspension and/or termination).

43. Instead of Berkadia disclosing facts unequivocally known by it for the $700,000 in impact fees (costs) being removed from the Calabash loan transaction to HUD, Berkadia misled and lied to the federal government and stated that it did not know the reason for the removal of the fees.

44. As a calculated strategy to have HUD/FHA end and discontinue the investigation into the true and accurate facts, which, if discovered, would have placed Berkadia's FHA-insured business platform in jeopardy, Berkadia withdrew its request for a claim against the FHA-insurance fund and purchased the loan ("buy back") for an amount in excess of $14 million.

45. Purchasing the defaulted Calabash loan was Berkadia's mechanism for covering up its material misrepresentation and bright line violation that it had made to HUD, in an effort to avoid sanctions or other risk/liability.

**Rancho Project**

46. In July 2015, Plaintiff learned that Phil Long (Berkadia's Managing Director-Chief Credit and Risk Officer and Manager of PLG – Proprietary Lending Group), Plaintiff's immediate supervisor, intentionally withheld significant facts relating to a bridge loan on a project called Rancho Sol Y Luna ("Rancho").

47. Bridge loans funded by a Lender, or a related party, are defined by the applicable federal guidelines as an identity of interest transaction.  The guidelines require identity of interest transactions be disclosed within the underwriting recommendation made by Berkadia to HUD.

48. One June 18, 2015, Mr. Long and Plaintiff discussed at length (via email) the importance of disclosing to HUD an increase to the bridge loan, as well as the timing for the same.

49. In July 2015, Berkadia was about to receive a Firm Commitment from HUD on the Rancho loan.

50. Mr. Long was monitoring the situation closely because the money was being borrowed from the balance sheet of Berkadia's parent companies, Berkshire Hathaway and Leucadia National.

51. When Plaintiff advised Mr. Long that a Firm Commitment was going to be received from HUD, Mr. Long, only then, told Plaintiff the bridge loan had previously been increased.

52. Plaintiff inquired as to when and for how much the loan had been increased, as this information was never disclosed to him prior to that point.  It was at that point Plaintiff learned it was only six business days after his lengthy email exchange with Mr. Long on June 18, 2015 that the loan had been increased by $10 million – with the commitment by Berkadia, and Phil Long, to fund this loan within less than six business days – for the sole purpose of Berkadia increasing their production and profits by allowing the Borrower to purchase another project to be financed by Berkadia.

53. The failure to disclose the increase of the bridge loan was a direct violation of the identity of interest provisions by which Berkadia was required to abide and is identified specifically as a violation that could trigger a sanction under applicable guidelines.

54. Immediately upon learning of the non-disclosure, Plaintiff, in compliance with his responsibilities and obligations, notified HUD of the increase in the amount of the bridge loan.

55. Upon being confronted about this issue by Plaintiff, Mr. Long claimed (incredibly, yet conveniently) that he did not remember his email exchange with Plaintiff only six business days earlier about the importance of disclosing the information to Plaintiff and HUD.

56. Plaintiff also advised Mr. Long that the loan would have received much more scrutiny had the proper and timely disclosure been made when required, which is why Mr. Long withheld information from Plaintiff and which Plaintiff was required to disclose.

57. Although Mr. Long was the Chief Credit Officer for Berkadia, it soon became obvious that he was not aware (as he should have been) of specific HUD rules/regulations dictating that a significant portion of the Berkadia bridge loan would not be allowed to be paid upon the closing of the FHA-insured loan.  Thus, the bridge loan repayment terms promised by Phil Long to the Borrower, Berkshire Hathaway, and Leucadia National would not be fulfilled.

58. Mr. Long was under the mistaken impression that, upon the closing of the FHA-insured loan, the bridge loan that was financed from the balance sheet of the parent companies would be paid out in full immediately at the time of the closing.

59. Plaintiff informed Mr. Long that pursuant to HUD rules/regulations, fifty percent of the loan had to be withheld at the time of closing, given that the borrower had repairs that would not be completed for ten to twelve months after the closing date.

60. Upon learning this information, Mr. Long wanted Plaintiff to request a waiver from HUD HQ in order for the borrower to receive the full amount of the loan on the closing date.

61. Plaintiff declined Mr. Long's request because he made the same request three weeks prior that was declined, and to do so again when the waiver was so recently declined would be solely for production purposes and would amount to a violation of HUD's "bright line" rule.

62. In email correspondence dated July 24, 2015, Mr. Long threatened Plaintiff's employment, stating,

> "THIS IS A WHAT HAVE YOU DONE FOR ME LATELY BUSINESS… SOMETIMES YOU HAVE TO DO THINGS OTHER PEOPLE WANT, EVEN IF YOU REALLY DON'T WANT TO, AND EVEN IF YOU REALLY DON'T BELIEVE IT…" (emphasis in original).

63. Additionally, Mr. Long stated to Plaintiff via email,

> "… you are not hurting me, only yourself at this point. Unnecessarily… this is going to blow up internally, and it does not have to be that way. You[r] position can be 'right' nine ways to Sunday, nobody is going to want to hear it."

64. Plaintiff was uncomfortable about this contentious exchange with his direct supervisor, Mr. Long. Plaintiff believed that his job was being threatened and that Mr. Long was promoting and directing production to the detriment of governmental compliance, which Berkadia and Plaintiff were explicitly required to uphold.

65. Additionally, the written words of Mr. Long were in direct contradiction to the publicly-promoted Berkadia Values (Integrity is Everything, We Take the Long View, We Never Fear Doing the Right Thing, Interactions Deserve Our Utmost Respect and We Set the Highest Standards and Hold Ourselves To Them).

### Plaintiff's Concerns Raised to Berkadia Executive Committee Members

66. In August 2015, shortly after Mr. Long threatened Plaintiff's employment via email, Plaintiff raised concerns about Mr. Long to two members of Berkadia's Executive

11

Committee, Justin Wheeler (Chief Executive Officer) and Ernie Katai (Executive VP-Head of Production).

67. Specifically, Plaintiff stated that he believed Mr. Long had intentionally withheld information that Berkadia was required to disclose to HUD, and that Mr. Long had acted in a manner that violated HUD's bright line rule.

68. Mr. Wheeler and Mr. Katai advised Plaintiff to approach Mr. Long directly to discuss the issue.

69. That same day, Plaintiff spoke directly with Mr. Long about the issue (with John Norton and Steve Ervin present in the room) and asked Mr. Long to assure him that he did not intentionally fail to disclose information that Plaintiff and Berkadia were required to disclose to HUD.

70. In response, Mr. Long became visibly angry and upset, stated that he did not like being accused of "unethical behavior," and stormed out of the room.

71. Eventually, Mr. Long returned to the room and stated that he did not intentionally fail to disclose the information.

72. As a result, Plaintiff contacted Mr. Wheeler and Mr. Katai the next day to report the events.

73. While Mr. Wheeler and Mr. Katai subsequently applauded Plaintiff for bringing up the situation, the situation apparently was not addressed adequately with Mr. Long, as on at least three occasions between that day and including Plaintiff's day of termination, Mr. Long told Plaintiff, "You didn't do yourself any favors by going to the Executive Committee."

12

**Feedback Forum**

74. Shortly before Plaintiff's termination, Randy Jenson (former President, current CFO, and direct supervisor of Phil Long, Plaintiff's supervisor) required Plaintiff to provide a "Feedback Forum" for the originators to provide feedback on the underwriting staff upon each loan submission.

75. Plaintiff agreed to do the same, but also requested that the underwriting staff be able to provide feedback on the originator at the same time.

76. Plaintiff prepared approximately five proposed questions for originators to answer about underwriting, and approximately five proposed questions for underwriters to answer about originators.

77. All of Plaintiff's proposed questions, which were approved by the underwriting management team, were approved by Berkadia (Randy Jenson, Phil Long, and Steve Ervin), with the exception of one question that underwriting was to answer about the originator. The disallowed question was, "At all times was a 'bright line' maintained between the originator and the underwriting team of the transaction?"

78. The primary purpose for Plaintiff's desire to include this question on the form was Plaintiff's perception that Berkadia's culture – including his supervisor (Mr. Long), his supervisor's supervisor (Mr. Jenson), and Steve Ervin – was promoting production and profits to the detriment of underwriting/compliance and the requirements Plaintiff was required to uphold.

79. Despite Plaintiff's repeated requests for this question to be included on the feedback form, he was informed that the question would not be approved by Randy Jenson, Phil Long, and Steve Ervin because they "did not want a paper trail" on the issue.

80. In response, Plaintiff advised Berkadia that if he learned of a violation of HUD rules, he would not submit the loan request (or that he would retract the loan request if it had already been submitted).

81. In fact, on certain occasions, Plaintiff declined to submit to HUD loan deals that he felt were not in compliance with HUD rules/regulations.

82. There were at least two loan deals that Plaintiff blocked from submitting to HUD in the last few weeks of his employment with Berkadia because the deals did not meet HUD guidelines, nor did Berkadia investigate the concerns raised by Plaintiff.

83. It was around this time that Plaintiff also learned of the direct financial interest that Ranch Capital, LLC (of which Randy Jenson is the President and Founder) and Randy Jenson, personally, had in the production of Berkadia, over and above his interest as an employee of Berkadia.

## Plaintiff's Termination

84. On October 13, 2016, Plaintiff was asked to attend a one-on-one meeting with Mr. Long at the Marriott in St. Louis.

85. During that meeting, Plaintiff was fired by Berkadia.

86. Plaintiff asked for an explanation as to why he was being fired.

87. Mr. Long said the company is making a change, and that "this is the hardest thing I've ever done."

88. Plaintiff asked for feedback as to where his job performance had fallen short, but Mr. Long did not identify any performance-related issues or problems. Rather, Mr. Long stated, "We're just making a change. We need to make a change."

89. Plaintiff continued to press for the reason(s) why he was being fired, to which Mr. Long responded, "You didn't do yourself any favors by going to the Executive Committee."

## COUNT I
## Violation of the False Claims Act

90. Plaintiff reasserts and re-alleges the allegations set forth above.

91. In the context of its loan submissions to HUD, the False Claims Act prohibits Berkadia from engaging in activities set forth in 31 U.S.C. § 3729(a).

92. Generally, the False Claims Act creates liability for a company that knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; etc.  31 U.S.C. § 3729(a).

93. In addition to the broad purpose of the False Claims Act, the statute also contains a specific anti-retaliation provision, which states as follows:

> Any employee … shall be entitled to all relief necessary to make that employee … whole, if that employee … is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee … in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter.

31 U.S.C. § 3730(h)(1).

94. Plaintiff engaged in one or more lawful acts in an effort to stop Berkadia from committing one or more violations of the False Claims Act, 29 U.S.C. § 3729 *et seq*.

95. Specifically, Plaintiff undertook ongoing efforts to prevent Berkadia from submitting false claims and/or making false statements to the U.S. Government.

96. He worked against the grain of Berkadia's culture of promoting production and profits over compliance/underwriting, in an effort to prevent production employees from pushing underwriting into making false claims/representations.

97. When Plaintiff undertook these efforts, he was resisted and/or confronted by Berkadia management.

98. Plaintiff also made multiple complaints to Berkadia about compliance violations, including one complaint about his supervisor (Mr. Long) to two members of Berkadia's Executive Committee.

99. Further, Plaintiff made a complaint/warning to Berkadia (specifically, Mr. Jenson) about the need to disclose Berkadia's regulatory violations made in connection with the Calabash project.

100. Plaintiff refused to submit loan deals that violated HUD rules/regulations.

101. Plaintiff was fired for being too large an obstacle for Berkadia's production staff in their desire to push deals through the HUD program with minimal (or no) resistance for the sake of profits.

102. As a result of Plaintiff's efforts to stop one or more violations of the False Claims Act, Berkadia threatened Plaintiff and ultimately terminated Plaintiff's employment.

103. There is a direct causal connection between Plaintiff's aforementioned legally protected activity and Berkadia's termination of Plaintiff's employment.

104. Berkadia's actions violated the anti-retaliation provision of the False Claims Act, 31 U.S.C. § 3730(h).

105. As a result of Berkadia's violation of the anti-retaliation provision of the False Claims Act, Plaintiff has sustained damages.

WHEREFORE, on Count I of his Complaint, Plaintiff demands judgment against Defendant Berkadia Commercial Mortgage LLC and prays for: (1) reinstatement with the same seniority status that he would have had but for the discrimination; (2) an award of actual damages in an amount to be proven at trial, including but not limited to back pay, front pay, lost benefits,

and emotional distress damages; (3) liquidated damages; (4) attorneys' fees, costs, and expenses; and (5) such other relief as the Court deems fair and equitable.

## COUNT II
## Wrongful Discharge in Violation of Public Policy

106. Plaintiff reasserts and re-alleges the allegations set forth above.

107. Plaintiff brings this count pursuant to the common law of the State of Missouri, under the public policy exception to the Missouri at-will employment doctrine.

108. The False Claims Act, the National Housing Act, and the HUD rules/regulations referenced herein set forth a clear mandate of public policy to indicate that in connection with FHA-insured loan transactions, a lender, such as Berkadia, must: (a) comply with all applicable governmental rules and regulations; (b) disclose all required information to the federal government; and (c) provide accurate and truthful information to the federal government.

109. Berkadia terminated Plaintiff because he engaged in legally protected activity, in that he: (a) complained to Berkadia about its unlawful practices; (b) undertook efforts to prevent Berkadia from engaging in unlawful practices in violation of the National Housing Act, HUD rules/regulations, and/or the False Claims Act; and/or (c) acted in a manner that public policy would encourage.

110. The conduct of Berkadia violated public policy, as expressed in the National Housing Act, HUD rules/regulations, and/or the False Claims Act.

111. Plaintiff's legally protected activity, described above, was at least a contributing factor in Defendant's decision to terminate Plaintiff's employment.

112. As a result of Defendant's conduct, Plaintiff has sustained damages.

113.    Defendant's conduct was outrageous because of Defendant's evil motive or reckless indifference towards the rights of Plaintiff, and is such that an award of punitive damages is warranted to deter and punish Defendant and others from such future conduct.

WHEREFORE, on Count II of his Complaint, Plaintiff demands judgment against Defendant Berkadia Commercial Mortgage LLC and prays for: (1) an award of actual damages in an amount to be proven at trial, including but not limited to back pay, front pay, lost benefits, and emotional distress damages; (2) equitable relief, including reinstatement and front pay; (3) punitive damages to punish and deter Defendant and others from like conduct; (4) costs incurred in prosecuting this matter; and (5) such other and further relief as the Court deems just and proper under the circumstances.

### COUNT III
### Quantum Meruit

114.    Plaintiff reasserts and re-alleges the allegations set forth above.

115.    While employed with Berkadia, Plaintiff's regular and customary compensation included a salary, as well as an annual bonus, as compensation for his employment and his services.

116.    Plaintiff's annual bonus for a given year was paid by Berkadia in approximately February of the following year.  The bonus was paid based on services provided by Plaintiff during Berkadia's Fiscal Year, which ran from January 1 to December 31.

117.    Plaintiff performed services for Berkadia from January 1, 2016 until Berkadia terminated his employment on October 13, 2016.

118.    Defendant accepted the services that Plaintiff provided from January 1, 2016 until October 13, 2016.

119.    Plaintiff was not paid any portion of his annual bonus for the time period of January 1, 2016 through his date of termination on October 13, 2016.

120. The bonus compensation requested by Plaintiff for the benefits produced by him is based on customary and reasonable rates for such services or like services at the time and in the industry and locality where the services were rendered.

121. Plaintiff is entitled to a pro-rated portion of his annual bonus for the time period of January 1 to October 13, 2016.

122. Plaintiff is entitled to an award of pre-judgment and post-judgment interests at the applicable legal rate.

WHEREFORE, on Count III of his Complaint, Plaintiff demands judgment against Defendant Berkadia Commercial Mortgage LLC and prays for: (1) compensatory damages; (2) pre-judgment and post-judgment interest as provided by law; (3) costs of suit; and (4) all other relief as the Court deems just and proper under the circumstances.

## DEMAND FOR JURY TRIAL

Plaintiff hereby requests a trial by jury of all issues triable by jury.

Respectfully submitted,

**RIGGAN LAW FIRM LLC**

/s/ *Russell C. Riggan*
Russell C. Riggan  #53060MO
Samuel W. Moore  #58526MO
132 W. Washington Ave., Ste. 100
Kirkwood MO  63122
314-835-9100
314-735-1054 fax
russ@rigganlawfirm.com
smoore@rigganlawfirm.com

*Attorneys for Plaintiff Richard Sherman*