UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

RICHARD SHERMAN,               )
                               )
        Plaintiff,             )
                               )
v.                             )        No. 4:17 CV 2183 RWS
                               )
BERKADIA COMMERCIAL            )
MORTGAGE LLC,                  )
                               )
        Defendant.             )

## MEMORANDUM & ORDER

Defendant Berkadia Commercial Mortgage LLC (Berkadia) moves for summary judgment on Plaintiff Richard Sherman's False Claims Act (FCA) retaliation and state law claims. Sherman claims that he was terminated from his job as the Chief Underwriter at Berkadia because he acted to prevent Berkadia from submitting false claims to the department of Housing and Urban Development (HUD). Specifically, Sherman says he was fired because he spoke out against misrepresentations involving two projects, alleged violations of a "bright line rule," and appraisal shopping. With respect to the two projects, Sherman does not present evidence from which a jury could find that he took "protected actions" to prevent a False Certification. With respect to the other alleged violations, Sherman does not present evidence from which a jury could find that he was terminated because of a protected activity. As a result, Berkadia is

entitled to summary judgment on Sherman's FCA claim. For similar reasons, Berkadia is entitled to summary judgment on Sherman's wrongful discharge claim. Finally, because Berkadia's discretionary bonus plan controls Sherman's eligibility for a bonus, I must grant summary judgment on his quantum meruit claim as well.

## BACKGROUND

### A. Sherman's objections to Berkadia's Statement of Facts

Sherman objects to 92 of the 144 paragraphs contained in Berkadia's statement of facts on the grounds that Berkadia either does not cite to the factual record or fails to lay a foundation for those facts. I have carefully reviewed Berkadia's filings and the cited references to the factual record. I do not find support for Sherman's objections. Berkadia submitted 55 exhibits accompanying its statement of undisputed material facts, and it accurately cited to them. Berkadia also submitted an affidavit from outside counsel with personal knowledge laying a foundation for these exhibits. As a result, I will deem as admitted any facts submitted by Berkadia that Sherman fails to contradict with specific, contrary facts. Local Rule 7 – 4.01(E).

### B. Sherman's employment with Berkadia

Defendant Berkadia is a commercial real estate lender that originates and underwrites commercial mortgage agreements for multifamily housing developments. In support of these functions, Berkadia employs both mortgage

brokers and underwriters for the same projects. The brokers and underwriters work in communication with each other but with different purposes. The brokers' function is to originate and close mortgage agreements. The underwriters' function is to obtain FHA loan guarantees, and meet any HUD requirements, rules, and regulations in obtaining those guarantees. Because it brokers FHA-guaranteed loans, Berkadia must certify compliance with certain rules and policies promulgated by HUD. (Plaintiff's SUMF ¶ 21). If a developer defaults on an FHA-guaranteed loan, Berkadia may submit an Election to Assign the Loan to HUD. If HUD accepts the election, the lender will recover unpaid value of its loan.

Plaintiff Sherman worked at Berkadia from July 18, 2011, to October 13, 2016. He was hired as Berkadia's Vice President—FHA Chief Underwriter. (Defendant's SUMF ¶ 16). On September 27, 2013, Berkadia promoted Sherman into his role as special Vice President—FHA Chief Underwriter for the HUD group. (Id. at 21). In that role, Sherman oversaw the work of Berkadia's underwriters. He reviewed all loans before they were submitted to HUD. (Id. ¶ 22). Phil Long was Sherman's direct supervisor and Berkadia's Chief Credit officer. (Id. ¶ 6). Sherman also communicated frequently with Steve Ervin, Head of Production for HUD Lending. Ervin's team originated loans to be reviewed and submitted by the underwriting group. Sherman, Long, and Ervin were overseen by Berkadia's Executive Committee, including Chief Financial Officer Randall

Jenson and Head of Production and Executive Vice President Ernie Katai. Karl Reinlein preceded Katai as Head of Production and Executive Vice President

One of Sherman's most important goals as Chief Underwriter was improving Berkadia's relationship with HUD regulators. Prior to Sherman's promotion, Berkadia had a poor relationship with HUD regulators. Berkadia received a warning letter from HUD in April 2011 concerning producers in its Raleigh office, (Plaintiff's SUMF ¶ 37), and its HUD license was allegedly in jeopardy. (Id. at 42) Long and Jenson acknowledge that Sherman made it a priority to build trust with HUD and that he generally reached that goal. (Long depo., 310:21-311:14; Jenson depo., 32:22-24, 33:18-34:3).

Despite his success, Sherman had challenging relationships with the Head of Production Ervin and at times with his Supervisor Long as well. (Defendant's SUMF at ¶ 24). Sherman and Ervin's disagreements led to visible and disruptive conflict according to John Norton, an independent consultant hired to address their relationship. (Id. at ¶ 24, 25, 29; ECF No. 27-17). Norton worked to improve Berkadia's FHA group for more than a year, starting in April 2015. (Norton depo., 39:11-44:11). Some other employees voiced concerns about Ervin's management style, including Long. (Defendant's SUMF at ¶ 29). Norton eventually concluded that Sherman should be terminated: "If I saw a glimmer of fundamental change in Rick I would speak up in his defense. I believe people can change. I do not sense at

all that Rick has it in him. After all this intensive work [sic]. For the good of Berkadia and also for [Long], I think this is the week." (Defendant's SUMF at ¶ 52). Sherman, for his part, expressed extreme doubt about his relationship with Ervin and their ability to work productively together. The relationship deteriorated to the point that, on May 19, 2016, Sherman told Long in an email that

> if Steve Ervin will remain the head of our FHA platform with oversight over the underwriting group or is envisioned to have a prominent management role in Berkadia's vision for 2020 (or even 2016), you should tee up the next Organizational Change Announcement with my name. If my role requires me to be a great collaborator with Steve Ervin, outside of him being in a MB role, see above.

(Defendant's SUMF ¶ 60, ECF No. 33).

For related reasons, conflict arose between Sherman and Long. During an August 5, 2016, meeting, Sherman accused Long of concealing a loan increase from him and HUD. (Defendant's SUMF at ¶ 131; Sherman Depo, 94:16-96:5). Long walked out of the meeting in frustration. (Long Depo., 132:16-133:5). Before that meeting, Sherman told Justin Wheeler and Ernie Katai about the same alleged concealment, in a car ride to the airport. (Defendant's SUMF at ¶ 130). Wheeler said that the experience made him think that Sherman was unhinged. (Id.) In an email exchange dated May 18-19, Sherman and Long discussed the state of their

professional relationship. Long noted that their relationship was "at an all time low" and that he wanted to understand the basis of Sherman's conflict with Ervin. (ECF No. 68-25 at 3). Sherman acknowledged in an email dated May 19, that "85% of [his] conflicts are closely linked to Steve Ervin (including [his] conflict with [Long])." (Id. at 1).

### C. Berkadia's Termination of Sherman

Sherman told Long in the same May 18 email chain that he was dissatisfied with his job and that he might leave Berkadia for another company. (Defendant's SUMF, ¶¶ 57-61). In April 2016, Sherman took an unplanned week off after Long and Norton discussed his performance with him. (Id. at ¶ 53). Long asked him by email whether the unplanned week off was a "white flag being raised," and Sherman responded "the flag is always on the table for either side to pick up and wave. . . . To discuss whether I want to be here or whether the company wants me here doesn't seem productive or healthy." (Id. at ¶ 54). Berkadia argues that Long decided to terminate Sherman at around this same time in April 2016. Sherman disputes that date. He argues that he was terminated on October 13, 2016, but he does not identify a date on which he believes the decision was made. (ECF No. 70 at n. 17).

On June 28, 2016, Long emailed a draft memorandum discussing how Berkadia should resolve the Sherman-Ervin conflict. (Defendant's SUMF at ¶ 67).

Long delivered an updated version of the memorandum on July 5, 2016, to Berkadia CEO Jim Wheeler. (Id. at ¶ 71). In the memorandum, Long acknowledges Sherman's success in improving Berkadia's relationship with HUD. Long also mentions several strengths of Sherman's. Despite those strengths, Long judged that "Rick is good at many things and has a lot of good qualities. but [sic] we do not think he is the right person long-term, and we are building to be long-term great, not long-term good." (Id.). In his deposition testimony, Long stated that Jenson and he had decided to terminate Sherman by June 28, although he still hoped that something might chayepnge their assessment. (Long depo., ECF No. 68-12 at 217:5-221:16).

By July 5, Long had made significant strides towards hiring a new Chief HUD Underwriter to replace Sherman. (ECF No. 59-36). Long sent an email on that day to Wheeler and Jenson explaining that he had met with a potential replacement. (Id.) Long had reportedly talked with the candidate by phone for an hour and then in person for three hours while traveling. (Id.) Long indicated that this candidate was their preferred choice: "If we talk to [the candidate] . . . and we like him, we are prepared with an offer and he said he would leave in the usual 2 weeks." The preferred candidate declined the offer from Berkadia, and Berkadia did not secure a replacement for Sherman until October 2016. (Defendant's SUMF at ¶¶ 75-76).

On October 13, 2016, Long told Sherman that Berkadia was terminating his employment with Berkadia. Both parties agree that Long made the decision to fire Sherman. (Plaintiff's SUMF at ¶ 287; Defendant's SUMF at ¶¶ 66-76). Sherman also suggests that Wheeler "was actively involved" in his termination. (Plaintiff's SUMF at ¶ 313). On October 14, 2016, Sherman thanked Long for the favorable light in which he announced Sherman's departure from Berkadia. (Defendant's SUMF at ¶ 77). Long responded that Sherman "did . . . a lot of really good things" at Berkadia, and that he had "a lot of respect" for Sherman. (Id.) Sherman received $58,629.04 in severance pay. (Plaintiff's SUMF at ¶ 349). Berkadia also offered Sherman $240,000 in compensation if Sherman agreed to surrender any legal claims might raise against Berkadia. (Id. at 349-351). Sherman argues that this amount represents his prorated bonus for 2016. (Id. at 350). Sherman refused to sign the release of claims. (Id. at 352).

### D. Sherman's Lawsuit and Allegations Against Berkadia

On July 31, 2017, Sherman filed this lawsuit, claiming that Berkadia terminated him in retaliation for taking actions protected by the FCA. (ECF No. 1). Specifically, Sherman alleges ten instances where he took protected actions under the FCA. Those ten instances pertain to (a) two projects completed before his firing, (b) ongoing complaints concerning a "bright line rule," (c) appraisal shopping, and (d) projects he refused to submit to HUD. Sherman also argues that

his termination violated Missouri's wrongful discharge common law cause of action. Under a third claim for quantum meruit, Sherman argues that he should have received a prorated bonus for his 2016 employment with Berkadia, but did not.

Sherman argues that I have jurisdiction over his state law claims under 28 U.S.C. §§ 1332 and 1367. Sherman does not identify the state of citizenship of Berkadia's members. Berkadia is a limited liability company, not a corporation. Without that information, I cannot determine whether jurisdiction is appropriate under § 1332. However, I may exercise supplemental jurisdiction over Sherman's state law claims if they arise from the same "nucleus of operative fact" as his FCA retaliation claim. United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 725 (1966). Sherman's wrongful discharge and quantum meruit claims meet this test. They both arise from Sherman's termination such that Sherman would "ordinarily be expected to try them all in one judicial proceeding." (Id.). As a result, I will exercise supplemental jurisdiction over them.

### 1. The Calabash Project

The first alleged FCA violation raised by Sherman involves the Calabash Town Center Project, which financed the development of a 168-unit apartment complex in North Carolina. Berkadia states that the Calabash loan was underwritten by Capmark, a company that sold some of its HUD-guaranteed assets

to Berkadia in 2009. Berkadia closed the Calabash loan in July 2010. (Defendant's SUMF at ¶ 83).

When submitting the Calabash loan in November 2009, Berkadia employee Jim Tanner failed to disclose certain impact fees to HUD and the developer. (Plaintiff's SUMF at ¶ 95). The impact fees totaled $873,000 and would be assessed to the Calabash development for sewer and water infrastructure. (Defendant's SUMF at ¶ 85). The developer defaulted on the loan on July 1, 2012, and the construction contractor sued Berkadia in January 2013. (Id.) It argued that the undisclosed impact fees led to the developer's default.

On November 14, 2012, Berkadia filed an Election to Assign the Loan to HUD, seeking payment based on the FHA loan-guarantee on the property. (Id. at 84). At HUD's prompting, Berkadia hired outside counsel to investigate the removal of impact fees. (Plaintiff's SUMF at ¶¶ 90, 95). The resulting investigation revealed that Tanner knew the impact fees should have been included but allowed the loan to be submitted to HUD without those fees. (Id. at ¶ 95). In June, 2013, outside counsel wrote a memorandum summarizing these facts to Berkadia's executive counsel. (Id.) Sherman obtained a copy of this memorandum. (Id. at ¶ 96). On July 1, 2013, Sherman emailed Jenson stating

> Karl spoke with me about the issues the company is facing on this project. I know the EC understands the gravity of the situation, but wanted to provide you with my opinion. From what I have been told, I agree with the [sic] your position.

> Based on what I know, if the information is disclosed, it is possible that our company could be sanctioned/suspended/terminated by HUD. If the information is not disclosed, but is discovered by HUD – it is more than a possibility. I recognize the need to gather 100% of the information before making a final decision, but I can see where this is headed. I would like to think that this was an isolated incident by the Raleigh office, but I don't believe that to be true – nor will HUD (Note: our annual review by HUD will state that they have concerns about our Raleigh office and the lack of a "bright line" between our production and underwriting).
>
> If there is anything I could do to help, any information you would like on the HUD program, any information you want on our Raleigh operations… just let me know.

(Id. at 106).

Head of production, Reinlein sent a second, different memorandum to HUD, dated July 18, 2013. That second memorandum explained some of the facts in the first memorandum but allegedly omitted two pieces of information: 1) that Tanner told Berkadia production staff to take out the impact fees without telling the underwriter, and 2) that the mortgagor did not have sufficient funds to cover those additional fees. (Id. at ¶¶ 116-117). Berkadia decided to repurchase the loan from HUD and reverse the assignment, ending further HUD inquiry into the default. (Defendant's SUMF at ¶¶ 97, 107).

Sherman was promoted after Berkadia repurchased the loan from HUD. He concedes that he read the second memoranda only after it was submitted to HUD on July 18, 2013. (Plaintiff's SUMF at ¶ 118). Upon reading that memorandum,

however, he says that he complained to Berkadia's Compliance Officer, Charles Green. (Id. at 122). According to Sherman, (1) he told Green that Reinlein misrepresented the facts to HUD, (Sherman Depo, 45:24-46:7), (2) Green agreed with that statement, and (3) Green also agreed that "it was an issue that needed to be explored." (Id. at 47:5-20). Sherman acknowledged in his deposition that he did not ask Green to take further action nor follow-up with Green to see what had happened. (Id. 48:13-21). He also stated that he did not recall discussing the alleged misrepresentation to anyone else in Berkadia management. (Id. at 47:25-48:9).

## 2. The Rancho Project

The second alleged violation raised by Sherman pertains to an apartment complex in California, known as "Rancho." The developers of this project needed a bridge loan to secure additional financing and revenue. (Plaintiff's SUMF ¶ 136). Berkadia sought an FHA loan guarantee on the project from HUD. Before Berkadia received a firm commitment from HUD on the bridge loan, the borrower informed Berkadia that it would seek a $10 million increase from the lender to provide equity for another project. On April 2, 2015, Long informed Sherman by email about the contemplated increase. (Defendant's at ¶ 117; ECF No. 59-44.). On June 4, Long forwarded another email to Sherman, which specified that the Rancho bridge loan would close on June 26, 2015. (Defendant's SUMF at ¶ 118;

ECF No. 59-45). The underwriter for this project was cc'ed to the same email chain on June 3, receiving notification of the same June 26 closing date. (Defendant's SUMF at ¶ 119; ECF No. 59-45).

On the day of the loan increase, the production team failed to notify the underwriting team that the increase actually closed. Long received an email on June 26, notifying him that the bridge loan had increased. (Defendant's SUMF at ¶ 119; ECF No. 59-48). Long and Sherman did not discuss the fact that the loan had increased until July 10, after Sherman sent Long an email explaining that HUD was about to issue a firm commitment. (Plaintiff's SUMF at ¶ 151-52). Long asked in response, "This is exciting. Are they aware that the underlying loan has been upsized? (to an amount a few million inside the loan before HUD.)"(Id. at ¶ 152). Sherman replied "No. Has the payoff increased? This is important as it goes to our incentive to recommend the risk. Not a small issue in HUD's view." (Id. at 157). On July 13, 2015, Berkadia received the firm commitment from HUD on the Rancho loan. (Defendant's SUMF at ¶ 126). Sherman disclosed the increase in the Rancho loan to HUD by phone on July 17, 2015, and by email on July 20, 2015. (Id. at ¶¶ 127-28). In the email to HUD, Sherman represented that the increase in the bridge loan did not undermine the underwriting, program intent, or HUD requirements. (Id. at ¶ 128). HUD subsequently issued an amended firm commitment, reflecting the increased amount of the loan. (Id. at ¶ 129).

Sherman later accused Long of intentionally withholding notice of the increase so that HUD would review the loan with less scrutiny. On August 5, 2015, Sherman made this allegation to Katai and Wheeler in a car ride to the airport. (Id. at ¶ 130). Later that day, Sherman repeated this allegation to Long. (Id. at ¶ 131; Sherman Depo, 94:16-96:5). After leaving the room in frustration, Long reportedly denied Sherman's allegation. (Long Depo., 130:19-133:5; Sherman Depo, 95:19-96:5). In an August 6, 2015 email, Sherman told Wheeler and Katai that he believed Long's denial was truthful and sincere. (Defendant's SUMF at ¶ 136; ECF No. 59-53). Sherman now claims that he lied to Katai and Wheeler about believing Long's sincerity.

### 3. Alleged Bright Line Violations

In addition to these project-specific complaints, Sherman argues that Berkadia violated a "bright line" separating underwriting and loan origination functions. According to Sherman, this bright line rule mandates that underwriters, and not loan originators, hire any third-party consultants used to evaluate financial sustainability. (Plaintiff's response, ECF No. 69 at 8). This rule is articulated in Berkadia's Quality Control Plan. (Id.) HUD's Multifamily Accelerated Processing (MAP) Guide further states that any third-party appraiser must be selected by the underwriter and not the originator, broker, developer, or borrower. (Id.)

Sherman repeatedly raised concerns that Berkadia employees violated these bright line rules. In his response to Berkadia's statement of undisputed facts, Sherman identifies seven emails he sent highlighting potential bright line rule violations. (Plaintiff's SUMF, ¶¶ 236-38, 250-53). Sherman sent these emails between October 2015 and August 29, 2016. The emails refer to four named development projects including Providence Place Apartments, Sun Terrace Hermiston, Huckleberry, the San Jacinto Refinance project, and an unnamed project underwritten by Priscilla Harrell. (Id.). Sherman also cites deposition testimony about alleged bright line violations raised by three underwriters working with Sherman. (Id. at ¶¶ 257-59).

In four of these circumstances, Long responds to Sherman's concerns supportively. For example, on May 25, 2016, Long responded to Sherman's forwarded email saying that he thought "the process here was wrong (not close to right), and Tom [the mortgage broker's] response is completely out of line." (ECF No. 68-39). In two of these circumstances, no response from Long is provided by Sherman. In the seventh circumstance—the May 18, 2016 email chain—Long asks Sherman to clarify his concern. (ECF No. 68-25)("I would want to know what the banker should have done differently in each case. . . . We are fighting at the margins, and in both instances, I don't think anything egregious had happened at all."). Sherman argues that Mr. Long became "frustrated" during the May 18 email

exchange, criticizing Sherman. (ECF No. 70 at 16). Long acknowledged in this email exchange that their relationship was "at an all[-]time low." (ECF No. 68-25 at 3).

In addition to the above email exchanges, Sherman also sought to create accountability on this topic through a survey question concerning bright line rule violations. The survey was proposed by Jenson in July 2016. (Defendant's SUMF at ¶ 137). He sought questions from Sherman that originators should answer regarding underwriters' performance on their projects. (Id. at ¶ 138). Sherman recommended that the survey also include questions that underwriters would answer regarding originators' performance. (Id. at ¶ 139). Sherman drafted ten questions, including one asking whether mortgage bankers "respected the bright line between mortgage banking and underwriting." (Id. at ¶ 141). When the draft questions were circulated, Long decided to exclude this question, but all of the other draft questions were included. (Plaintiff's SUMF at ¶ 263)

### 4. Appraisal Shopping and the Fountain Gardens Project

Finally, Sherman argues that Berkadia violated HUD appraisal shopping rules for some of its mortgage agreements, including the Fountain Gardens project. Sherman argues that he raised the alleged Fountain Gardens violation to Long, expecting he would take action against the originator. (Plaintiff's SUMF at ¶ 273). Long allegedly took no action initially. (Id. at ¶ 274). Berkadia refrained from

submitting the Fountain Gardens loan, a decision that Sherman says was made after he was terminated because Berkadia anticipated Sherman would file this suit. (Id. at ¶¶ 276-278). Sherman also argues that he was terminated because he refused to submit two loans to HUD for the Melissa Town Center and ICF projects, respectively. (Id. at ¶¶ 280-286). Sherman allegedly blocked these two projects "in the last few weeks" of his employment. (Sherman Decl. ECF No. 68-9 at ¶ 66).

## LEGAL STANDARD

Summary judgment is appropriate if the evidence, viewed in the light most favorable to the nonmoving party, demonstrates that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Lynn v. Deaconess Med. Ctr., 160 F.3d 484, 486 (8th Cir. 1998) (citing Fed. R. Civ. P. 56(c)). The party seeking summary judgment bears the initial responsibility of identifying the basis of its motion and those portions of the affidavits, pleadings, depositions, answers to interrogatories, and admissions on file which it believes demonstrates the absence of a genuine issue of material fact. Celotext Corp. v. Catrett, 477 U.S. 317, 323 (1986). When the moving party makes and supports such a motion, the nonmoving party may not rest on his pleadings. Id. at 324. Instead, the nonmoving party must produce sufficient evidence to support the essential elements on which he bears the burden of proof. Id. at 324.

# ANALYSIS

## I.  False Claims Act Retaliation

The FCA provides that an employer may not terminate, or otherwise retaliate against an employee, "because of lawful acts done by the employee . . . in furtherance of an action under [the FCA] or other efforts to stop 1 or more violations of this subchapter." 31 U.S.C. § 3730(h)(1). The Eighth Circuit has adopted a four-part test to determine if a plaintiff has established a retaliation claim under this section. Namely, "the plaintiff must prove that (1) the plaintiff was engaged in conduct protected by the [FCA]; (2) the plaintiff's employer knew that the plaintiff engaged in the protected activity; (3) the employer retaliated against the plaintiff; and (4) the retaliation was motivated solely by the plaintiff's protected activity." Elkharwily v. Mayo Holding Co., 823 F.3d 462, 470 (8th Cir. 2016), cert. denied, 137 S. Ct. 481 (2016), reh'g denied, 137 S. Ct. 716 (2017) (quoting Schell v. Bluebird Media, LLC, 787 F.3d 1179, 1187 (8th Cir.2015)).

To meet the first criterion, regarding "protected conduct," an employee must either file a claim under the FCA or "take efforts to stop" an FCA violation. 31 U.S.C. § 3730(h)(1). These alternatives can be referred to as the "litigation clause," and "opposition clause," respectively. United States ex rel. Gates v. Austal USA, LLC, No. CV 14-0261-CG-M, 2015 WL 5782284, at *6 (S.D. Ala. Aug. 10, 2015), report and recommendation adopted sub nom, 2015 WL 5822654 (Sept. 30,

2015). Under the litigation clause, the employee must reasonably and "in good faith believe[]. . . that the employer is possibly committing fraud against the government." Schell v. Bluebird Media, LLC, 787 F.3d 1179, 1187 (quoting Schuhardt v. Washington Univ., 390 F.3d 563, 566 (8th Cir.2004)). The opposition clause was added by Congress in 2009, and the Eighth Circuit has not articulated a distinct test to determine when this clause is satisfied. As a result, I will apply the same reasonable and "in good faith" belief standard to this circumstance: For Sherman to prevail under the opposition clause, he must have taken action designed to stop an FCA violation, and he must have reasonably "and in good faith believe[d]" that Berkadia was committing fraud against the government.

Secondly, Sherman must establish that Berkadia "had actual or constructive knowledge," and was therefore "on notice" that he was taking a protected action. Schuhardt v. Washington Univ., 390 F.3d 563, 568. Thirdly, Sherman must also show that he was retaliated against by being "discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment." 31 U.S.C. § 3730(h)(1). The parties do not dispute that Sherman was discharged, and that therefore this criterion is satisfied.

Finally, to prevail on a FCA retaliation claim, Sherman must offer evidence that Berkadia's retaliation "was motivated solely by the [his] protected activity." Elkharwily v. Mayo Holding Co., 823 F.3d 462, 470 (emphasis added). This strict

interpretation is derived from the Eighth Circuit's holding that employers are not liable if they would have taken the same action regardless of the employee's protected activity.[1] <u>Norbeck v. Basin Elec. Power Coop.</u>, 215 F.3d 848, 851 (8th Cir.2000). ("Each court that has addressed the question of whether a dual motive affirmative defense is available to an employer has concluded that it is."). Sherman need not prove this point at summary judgment. But he must offer <u>some</u> evidence that his alleged protected activities were the "sole motivation" for his firing.

## A. Timing of Berkadia's Decision to Terminate Sherman

To prevail on a False Claims Act retaliation claim, a plaintiff must demonstrate a causal fact: that he was retaliated against because of his protected

---

[1] Interpreting the same statute, other circuits have articulated more permissible standards. <u>See</u>, <u>e.g.</u>, <u>Hutchins v. Wilentz, Goldman & Spitzer</u>, 253 F.3d 176, 186 (3d Cir. 2001) ("[A] plaintiff must show that . . . his employer's retaliation was motivated, at least in part, by the employee's engaging in 'protected conduct.' ") (emphasis added); <u>U.S. ex rel. Yesudian v. Howard Univ.</u>, 153 F.3d 731, 736 (D.C. Cir. 1998) (same); <u>Jones-McNamara v. Holzer Health Sys.</u>, 630 F. App'x 394, 397 (6th Cir. 2015) (applying the burden-shifting <u>McDonnel Douglas</u> framework to False Claims Act retaliation claims); <u>Zahodnick v. Int'l Bus. Machines Corp.</u>, 135 F.3d 911, 914 (4th Cir. 1997) ("Thus, an employee must prove that (1) he took acts in furtherance of a qui tam suit; (2) his employer knew of these acts; and (3) his employer discharged him as a result of these acts."). The Senate report on the bill provides that

> the whistleblower must show . . . the retaliation was motivated, at least in part, by the employee's engaging in protected activity. Once these elements have been satisfied, the burden of proof shifts to the employer to prove affirmatively that the same decision would have been made even if the employee had not engaged in protected activity.
> S. Rep. 99–345, at 35 (1986), reprinted in 1986 U.S.C.C.A.N. 5266, 5300.

Despite this language, the Eighth Circuit has consistently required employees to offer evidence that their protected activities were the "sole motivation" for the employer's retaliation. <u>See</u> <u>Schell v. Bluebird Media, LLC</u>, 787 F.3d 1179, 1187 (8th Cir.2015) ("motivated solely by"); <u>Schuhardt v. Washington Univ.</u>, 390 F.3d 563, 566 (8th Cir.2004) (same); <u>Wilkins v. St. Louis Hous. Auth.</u>, 314 F.3d 927, 932-33 (8th Cir.2002) (same); <u>Wilkins v. St. Louis Hous. Auth.</u>, 198 F.Supp.2d 1080, 1086 (E.D.Mo.2001) (articulating the four criteria).

acts. As a result, timing can be dispositive. If the defendant decided to retaliate before the plaintiff took alleged protected acts, causation is defeated.

In this case, Sherman disputes Berkadia's assertion that Long decided to terminate Sherman in April 2016. Sherman points to Long's memorandum on June 28. Long concluded that

> As laid out above, the situation while unpleasant at times, and far from ideal, is not so bad that no matter what we fire Rick and hope for the best. In order of options, I recommend the following:
>
> - We find a replacement first—Hire [preferred candidate]—See below for details around recommendation[.] (Note that I think we got lucky with [preferred candidate] and it will otherwise be very difficult to conduct a job search while Rick [Sherman] is in the position[)].

(ECF No. 68-27).

Long's preferred recommendation on June 28 was to find a replacement for Sherman. (Id.) Earlier in the memorandum, Long recommended that terminating Sherman was not necessarily "an obvious choice, unless under the right circumstances." (Id.) Per Long's conclusion, those circumstances would be met if they could acquire their preferred candidate. (Id.) Long's deposition testimony does not cast doubt on this conclusion. During his deposition, Long was careful to

emphasize that he and Jenson "had decided" to terminate Sherman. (Long depo., ECF No. 68-12 at 217:8-9). Because they hadn't fired Sherman yet, Long still "hoped" that something "might happen" to change that recommendation. (Id. at 217:21-218:1).

Such speculation does not provide evidence from which a jury could find that Long decided to terminate Sherman after June 28. Nor does Sherman offer any other evidence that Long made his decision to terminate Sherman at any other later date. On the contrary, the only evidence concerning the timing of Sherman's termination shows that Long decided to terminate Sherman by June 28 at the latest.

As a result, Sherman cannot establish that he was retaliated against because of (1) his complaints concerning appraisal shopping at Fountain Gardens, (2) his refusal to approve loans for the Melissa Town Center and ICF projects, (3) nor his requested survey question regarding the bright line rule, all of which occurred after June 28, 2016. I will evaluate Sherman's other alleged protected activities in sequence.

**B. The Calabash Project**

Sherman argues that he took three protected actions concerning the Calabash project: (1)"advising [Berkadia] to fully disclose all material facts relating to the Calabash Project, even if such disclosure would lead to HUD sanction," (2) "complaining about Berkadia's fraudulent misrepresentations and omissions made

to HUD," and (3) "raising a renewed complaint about [Berkadia's] handling of the Calabash matter with [] Long in May 2016." (ECF No. 69 at 13).

Sherman does not offer enough evidence for a jury to find that he "advis[ed] [Berkadia] to fully disclose all material facts relating to the Calabash Project." (Id.) In support of his argument, Sherman quotes an email he sent to Jenson, on July 1, 2013. In the email, Sherman indicates the likelihood of certain outcomes. (Plaintiff's SUMF at ¶ 106). ("Based on what I know, if the information is disclosed, it is possible that our company could be sanctioned/suspended/terminated by HUD. If the information is not disclosed, but is discovered by HUD – it is more than a possibility."). Nowhere in the email does Sherman make a recommendation about courses of action. Instead he "recognize(s) the need to <u>gather</u> 100% of the information before making a final decision," (emphasis added) and he offers to help if requested. (Id.)

Sherman's complaints to Charles Green about the Calabash memorandum also does not satisfy the four criteria outlined above. Specifically, Sherman provides insufficient evidence that this conversation put Berkadia on notice, or that Berkadia terminated him because of this conversation. In reporting his concerns to the Compliance Chief Green, Sherman took no action beyond the scope of his assigned tasks. He also did not urge Green to take any action nor follow-up later on. Most importantly, Long did not decide to fire Sherman until late Spring or

Summer 2016, almost three years after Sherman's conversation with Green. Sherman does not offer any evidence to demonstrate that Sherman's comments concerning the Calabash Project in 2013 led to his termination three years later.

Finally, Sherman's mention of the Calabash Project in his May 18, 2016, email is not a protected action. In the email timestamped at 10:24 PM on that day, Sherman references Calabash in passing: "Another example is there was a MB that 'recommended' a third party. . . . The deal was Calabash." (ECF No. 68-25 at 1). The Calabash Project is used as an explanation of the consequences of mortgage brokers recommending third parties. It is referenced nowhere else in this email or other materials from this time. Sherman does not reference Calabash for the purpose of stopping an FCA violation but as an example in an argument.

As a result, Sherman does not present evidence to establish an FCA retaliation claim concerning the Calabash loan.

### C. The Rancho Project

Sherman also does not provide evidence that he took a protected action in the context of the Rancho Project. Sherman argues that he took three protected actions concerning the Rancho Project: (1)"confronting his supervisor, Mr. Long, about his failure to timely disclose an identity of interest transaction (bridge loan," (2) "complaining to Defendant's Executive Committee members (Mr. Wheeler and Mr. Katai) about Mr. Long's failure to timely disclose" the bridge loan increase

and (3) "refusing to . . . request a waiver from HUD," concerning HUD's fifty percent withholding rule for projects with pending repairs. (ECF No. 69 at 13).

For any of these actions to be protected, Sherman must have had a "reasonable and good faith belief," that Berkadia was committing an FCA violation related to the bridge loan increase or waivers from HUD. Schell v. Bluebird Media, LLC, 787 F.3d 1179, 1187. Sherman argues that Long failed to inform him of the fact of the increase in order to decrease HUD's scrutiny of the bridge loan application. The facts show otherwise. On June 4, Long forwarded Sherman an email chain indicating that the bridge loan increase would close on June 26. (Defendant's SUMF at ¶ 118; ECF No. 59-45). On June 3, the underwriter for the project received the same notification. (Defendant's SUMF at ¶ 119; ECF No. 59-45). Furthermore, Long repeated this information after the loan closed, on July 10, three days before HUD issued a firm commitment, but Sherman did not inform HUD of the increase until July 17. (Defendant's SUMF at ¶ 126-28). It is therefore not reasonable to believe that Berkadia intentionally withheld information of the loan increase, except by Sherman's own actions. Sherman had responsibility for reporting the increase, and he had the knowledge to do so, i.e., the June 3 email identifying the June 26 closing date.

Sherman also has no evidence to demonstrate that requesting a waiver on the construction hold for the Rancho Project would constitute an FCA violation.

Sherman says that he declined to request a waiver from HUD "because [he] had made an identical request on another project loan three weeks earlier that was declined by HUD, and another request on the identical issue would be considered being done solely for production purposes and would be inconsistent with program requirements." (ECF No. 69 at 15). Sherman does not cite to any statute, regulation, policy, or guidance that supports this conclusion. (ECF No. 69 at 15). The only support he offers is an identical statement he makes in a self-serving declaration. (ECF No. 68-9 at ¶ 42). Furthermore, as a matter of law, asking for a waiver cannot constitute a false claim or FCA violation, because it is not a declarative statement. As a result, Sherman does not provide evidence from which a jury could find that refusing to ask HUD for a waiver is a protected action.

### D. Bright Line Allegations

Finally, Sherman argues that Berkadia terminated him because he complained repeatedly about Berkadia's bright line rule violations. Specifically, Sherman presents evidence that he sent seven emails complaining about instances where mortgage bankers or borrowers recommended third party consultants or appraisers. (Plaintiff's SUMF, ¶¶ 236-38, 250-53). In these emails, Sherman presents evidence from which a jury could find he took protected actions. Long corroborated that four of these situations were inappropriate. (ECF No. 68-39) ("the process here was wrong (not close to right)"); (ECF No. 68-40) ("dangerous

path to go down"); (ECF No. 68-38) ("She is likely more right than they are.").
(ECF No. 68-41) ("I think it is a good point about checking with UW/ the bright
line—I think we will have the same issue on the blake/reed deal now that you raise
it."). Accordingly, a jury could find that Sherman reasonably and in good faith
believed that Berkadia was committing FCA violations by certifying compliance
with the bright line rule while potentially violating it.

To prevail on his claim, however, Sherman must also demonstrate that he
was terminated because of protected activities. Sherman agrees with Berkadia that
Long made the decision to terminate him. (Plaintiff's SUMF at ¶ 287). This
acknowledgement contradicts Sherman's argument that he was fired because of
these complaints: For four out of the seven emails that Sherman provides on this
matter, Long was supportive of Sherman's concerns. Sherman does not provide a
response from Long on two of the seven emails. In the seventh email, Long asks
Sherman to clarify his concern: "I would want to know what the banker should
have done differently in each case."(ECF No. 68-25). Long also questioned
whether any bright line rule violation was made in that instance:

> I think you are too hard on Steve on your view of what he is or is not
> doing here. I think Steve is much more supportive than most on
> respecting the third party process, and supportive of the Uw [sic]
> position generally. We are fighting at the margins, and in both
> instances, I don't think anything egregious had happened at all. It
> feels like you are saying banker, leave us alone to order third parties.
> Just my observation."

(Id.)

A chain of seven more emails follows, in which Long and Sherman shift to an overarching conversation about workplace relationships. In the last email on the narrower topic of the project, Long notes the following:

> I know you said move on, but I had an argument with Warren over this two days ago (Angela's deal) and I will no doubt have to discuss this multiple times with Steve, so if I have to defend it, I need to understand it.

> No need to answer tonight, but what should the banker have done in each case, and is there a clear protocol in place that each violated? What was Steve's shortcoming?

(Id.)

Sherman characterizes this email exchange as one that "began with Plaintiff raising concerns about Bright Line Rule violations, included additional statements by Plaintiff that Berkadia misrepresented facts (about Calabash) in its July 2013 memo to HUD, and ended with Mr. Long being 'frustrated' with Plaintiff and criticizing him." (ECF No. 69 at 16). However, Sherman does not argue, nor provide evidence, that Sherman's complaints were the reason why Long became frustrated. Instead, the email exchange provides evidence that Long became frustrated because of his inability to understand Sherman's recommendations. (ECF No. 68-25) ("so [sic] if a banker says rick i [sic] would like you to use this third party and they are on our list and we engage them we have a problem? if [sic] we are this far off on something this simple, I agree, i [sic] don't see it being

connected. i [sic] am pretty much out of answers, questions, suggestions, you name it i [sic] am out of it."). As a result, Sherman does not present evidence from which a jury could find that Long decided to fire Sherman because of any bright line complaints.

Sherman does not provide evidence from which a jury can establish the four elements of an FCA retaliation claim for any of his above examples. As a result, I must grant summary judgment on his FCA retaliation claim.

## II.    Wrongful Discharge

Sherman asserts that he was wrongfully discharged based on Missouri's "public-policy exception" to at-will employment. To prevail on a wrongful discharge claim, Sherman must establish three things: (1) a genuine issue of fact that Berkadia "violated a law, regulation, or some other clear statement of public policy[2]," (2) that he (a) "refused to violate the law or any well established and clear mandate of public policy as expressed in the constitution, statutes and regulations promulgated pursuant to statute," or (b) "reported to his superiors or to public authorities serious misconduct that constitutes violations of the law," and (3) that his "whistle blowing or refusals to violate the law or public policy was 'a

_____

[2] One line of Missouri cases only requires a plaintiff to show that he "harbored a good-faith belief" that the employer violated a clearly expressed public policy. Bazzi, 652 F.3d 943, 948 (citing Dunn v. Enter. Rent–A–Car Co., 170 S.W.3d 1, 7 (Mo.Ct.App.2005)). A second line of Missouri cases also requires a plaintiff to show that his "good-faith belief was an objectively reasonable one." (Id.)

contributing factor' in [Berkadia's] decision to terminate his employment." <u>Bazzi v. Tyco Healthcare Grp., LP</u>, 652 F.3d 943, 947 (8th Cir. 2011).

Sherman does not offer evidence from which a jury could find that these elements are satisfied. As discussed above, Sherman does not offer evidence establishing (1) that he advised Berkadia to fully disclosed the contents of the Calabash memorandum; (2) that he was terminated because he complained to Charles Green about the Calabash Project; (3) that his May 18 email referencing Calabash constituted an effort to prevent a violation of law; (4) that Long intentionally withheld information of the Rancho loan increase; (5) that complaining to the Executive Committee about the Rancho loan constitutes whistleblowing; (6) that any statute, regulation, policy, or guidance prohibited requesting a waiver concerning HUD's fifty percent withholding rule; or that he was terminated because of (7) bright line complaints, (8) the Fountain Gardens Project, (9) his refusal to submit HUD applications or (10) his survey question. As a result, Sherman cannot establish that he was a whistleblower or refused to violate the law *and* that he was fired for those actions, even under the more lenient "contributing factor" or "good faith" analysis of Missouri's wrongful discharge law. I must grant summary judgment on Sherman's wrongful discharge claim.

### III. Quantum Meruit

Finally, Sherman argues in his quantum meruit claim that he has not been paid just compensation for his services, because Berkadia did not pay him a pro-rated bonus for 2016. Sherman cannot recover under a quantum meruit theory if he has entered into a contract "for the very subject matter for which she seeks to recover." Lowe v. Hill, 430 S.W.3d 346, 349 (Mo. Ct. App. 2014). The Missouri Court of Appeals has applied this rule to affirm summary judgment on a quantum meruit claim where a company-wide, sales compensation plan governed a plaintiff's commission awards. Burrus v. HBE Corp., 211 S.W.3d 613, 619 (Mo. Ct. App. 2006). The situation here is functionally the same: Berkadia establishes that any bonus Sherman received was subject to a company-wide discretionary bonus plan. (Defendant's SUMF at ¶¶ 17-20; ECF No. 59-13). Under that bonus plan, employees are eligible for discretionary bonuses only if they are employed by Berkadia at the time the bonuses are paid. (Defendant's SUMF at ¶ 17; ECF No. 59-13).

Sherman argues that an exception to this rule applies when an employee is prevented from fulfilling an employment contract because he has been discharged in violation of that very contract. See Holland v. Tandem Computers Inc., 49 F.3d 1287, 1289 (8th Cir. 1995). As in Holland, however, Sherman does not have evidence to show he was wrongfully discharged or that his at-will employment

agreement was violated. Id. The exception noted in Holland does not apply. As a result, I must grant summary judgment on Sherman's quantum meruit claim.

Accordingly,

**IT IS HEREBY ORDERED** that Berkadia's motion for summary judgment, [60], is **GRANTED**. Plaintiff Sherman's claims are **DISMISSED** with prejudice. An appropriate judgment will accompany this Memorandum and Order.


RODNEY W. SIPPEL
UNITED STATES DISTRICT JUDGE

Dated this 15th day of January, 2019.